NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0330n.06

No. 12-5109

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Apr 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RUBY SHEFFEY, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT COURT |
| | ) | FOR THE EASTERN DISTRICT |
| v. | ) | OF KENTUCKY |
| | ) | |
| CITY OF COVINGTON, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| OFFICER RON ALLEN, | ) | |
| OFFICER ROBERT BACON, | ) | |
| OFFICER ERIC HIGGINS, | ) | O P I N I O N |
| OFFICER STEVE BOHMAN, | ) | |
| OFFICER WILLIAM WEBSTER, | ) | |
| and POLICE OFFICERS, | ) | |
| NAMES UNKNOWN, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: BOGGS and DONALD, Circuit Judges, and STAMP, District Judge.[*]

**FREDERICK P. STAMP, JR., Senior District Judge.** Plaintiff-appellant, Ruby Sheffey

("Sheffey"), appeals the opinion and judgment of the United States District Court for the Eastern

District of Kentucky ("district court") granting summary judgment in favor of the

defendants/appellees Ron Allen ("Allen"), Robert Bacon ("Bacon"), Eric Higgins ("Higgins"), Steve

Bohman ("Bohman"), and Sergeant William Webster ("Webster") (collectively "the responding

officers") and dismissing Sheffey's federal civil-rights claims against them, claims which she filed

---

[*] The Honorable Frederick P. Stamp, Jr., Senior United States District Judge for the Northern
District of West Virginia, sitting by designation.

in her capacity as executor of the estate of her son, Leroy Hughes ("Mr. Hughes"). On appeal, Sheffey argues that the district court erred in finding that the responding officers were entitled to qualified immunity relating to her allegations against them. For the reasons stated below, we affirm.

## I. Background

This civil action arises from an incident occurring on December 3, 2008, in Covington, Kentucky, which resulted in the death of Leroy Hughes.[1] On that Wednesday afternoon, Mr. Hughes, who at the time was fifty-two years old, stood six feet six inches tall, and weighed 410 pounds, was walking down a residential street located in the vicinity of two elementary schools. A witness who observed Mr. Hughes noticed him carrying a handgun and quickly placing the handgun in one pocket and clips and ammunition in a separate pocket upon the approach of a bus. The witness, believing that this behavior was abnormal and suspicious, called 911 to report a suspicious subject. Police then responded to the call, but did not find anyone matching the description given by the witness.[2] The same witness subsequently called 911 a second time, after noticing officers passing Mr. Hughes without stopping, to report that Mr. Hughes was now walking in the vicinity of two local elementary schools, and that responding officers would find him on the sidewalk in the school zone. At around 11:00 a.m., the responding officers arrived at the scene and, having received a report that Mr. Hughes was armed with a concealed weapon and was acting suspiciously in a school zone, attempted to stop Mr. Hughes.

---

[1] The facts surrounding this case have been taken from, and are explained in more detail in, the district court's description of the same in its memorandum opinion and order granting summary judgment. Sheffey has not challenged the district court's determination of the facts below.

[2] The witness had described Mr. Hughes as an "African American male man with gray jogging pants with a brown jacket with a hoodie on it."

Officer Allen was the first responding officer to locate Mr. Hughes. Officer Allen stopped his vehicle, opened his car door, and, standing behind the door for cover, drew his gun and ordered Mr. Hughes to the ground. Mr. Hughes ignored Officer Allen's orders, and instead shuffled back and forth on his feet and moved his hands around the area of his waistband, repeating the word "dynamite." Based upon this reaction to his commands, Officer Allen informed the dispatcher that Mr. Hughes was noncompliant, and that he was possibly a "Signal 2," which means that he was either intoxicated or mentally disturbed.[3] Around this same time, Officer Bacon, who had arrived at the scene contemporaneously to Officer Allen and had parked his vehicle behind Officer Allen's, drew his gun and also began to issue commands to Mr. Hughes.

Officers Bohman and Higgins then arrived at the scene and began to provide backup for Officers Allen and Bacon and clear the crowd of individuals and vehicles that had formed. Officer Allen then lowered his voice and began to approach Mr. Hughes, continuing to command him, verbally and with hand signals, to show his hands and get onto the ground. Officer Bacon offered backup to Officer Allen as he approached Mr. Hughes, who continued to react to the officers' commands as he originally had, by rocking on his feet, moving his hands around the area of his waistband, and repeating the word "dynamite." At Officer Allen's direction, Officer Bacon reholstered his firearm and removed his taser in anticipation of a less-than-lethal-force

---

[3]Mr. Hughes was diagnosed with paranoid schizophrenia in 1979, but lived alone at the City Heights housing complex in Covington for 25 years. The firearm in Mr. Hughes's possession on the day in question had been given to him by his sister Cynthia in anticipation of a friend retrieving it. When no one came to pick up the firearm, Sheffey, the appellant and Mr. Hughes's mother, claims that she requested that Mr. Hughes return it to her, as she did not feel comfortable with Mr. Hughes continuing to possess the firearm given his mental health condition. However, Sheffey further claims that, despite several requests to return the firearm, Mr. Hughes failed to do so. She has stated that she believes he was walking to her house to return it on the day of his death.

confrontation. As the officers approached, Mr. Hughes said, "fuck it, I'm out of here" and began to walk toward Officer Bacon. Accounts differ as to whether or not Mr. Hughes had his hands clenched as he approached Officer Bacon, but all accounts agree that he began to move to either approach Officer Bacon or to attempt to flee. Officer Bacon then, at the same time that Officer Allen directed him to do so, deployed his taser in probe mode, striking Mr. Hughes in the upper left shoulder/chest area. Witnesses agree that Mr. Hughes did not react to the deployment of the taser, except to say "ouch" and to reach to remove the probes.[4] *Id.* at * 14. Mr. Hughes continued to approach Officer Bacon and, upon instruction from Officer Allen, Officer Bacon cycled the taser and attempted to utilize the device a second time through the prongs already deployed. After the second attempt also failed, Officer Bacon dropped his taser, believing it to be ineffective against Mr. Hughes.

Mr. Hughes next reached into his pocket and threw a box of ammunition at Officer Allen, saying "fuck it, it's not loaded." Officer Higgins, at this time, fired his taser in probe mode twice into Mr. Hughes's back, which action, again, had little effect on Mr. Hughes, aside from causing him to turn to look at Officer Higgins. However, even as Mr. Hughes turned to face Officer Higgins, he continued to reach for his waistband, and Officer Higgins warned the other officers of this. As Mr. Hughes turned to look at Officer Higgins, the other officers present decided to use the opportunity of Mr. Hughes's diverted attention to take him to the ground by force. After a struggle, the officers successfully forced Mr. Hughes to the ground and ordered him to put his hands behind his back.

---

[4]Successful deployment of a taser in probe mode results in temporary neuromuscular incapacitation. As none of the probe deployments attempted on Mr. Hughes resulted in such incapacitation, the officers all indicated that they did not believe the taser had successfully deployed. Witnesses at the scene also testified that Mr. Hughes had no perceptible reaction to the tasers.

When Mr. Hughes refused to comply with this command, the officers on the scene began what would prove to be a roughly five-minute struggle to gain control of Mr. Hughes and place him in handcuffs.

After Mr. Hughes was taken to the ground and the struggle to place him in handcuffs commenced, Sergeant Webster arrived on the scene and witnessed the officers' continued verbal commands, as well as the physical struggle, which included further attempts by Mr. Hughes to reach for his waistband and attempts to push himself up to a standing position. During this struggle, Mr. Hughes also attempted to bite Officer Bacon's hand, prompting Officer Bacon to warn the other officers, "He's biting!" Sergeant Webster observed that Mr. Hughes was wearing particularly heavy clothing which Webster believed may have caused the failure of the previous attempts to subdue him by way of a taser. He accordingly lifted Mr. Hughes's shirt and drive stunned Mr. Hughes in the lower back. After this first attempt failed, he attempted to drive stun Mr. Hughes in the right hip, but again failed to elicit a response from Mr. Hughes.[5] Officer Higgins also attempted to use his taser in drive-stun mode over Mr. Hughes's clothing between his shoulder blades, but did not receive a response. As the struggle between all five responding officers and Mr. Hughes continued, Officer Higgins tased Mr. Hughes in drive-stun mode two more times above his clothing. Then, seeing an exposed patch of skin on his lower back, Officer Higgins tased Mr. Hughes on this patch of exposed skin. At that point, finding that Mr. Hughes continued to have no reaction to the repeated tasings, Officer Higgins abandoned the use of his taser. As Officer Higgins was tasing Mr. Hughes,

---

[5]Unlike the intended result of utilizing a taser in probe mode, in drive stunning a suspect, the intended result is pain compliance. Accordingly, rather than looking for neuromuscular incapacitation to gauge success, success of a drive stun is gauged simply upon whether the suspect complies with officer commands following the use of the taser due to the pain.

Sergeant Webster also utilized his taser in drive-stun mode two more times before he concluded that the taser was ineffective, and ceased to use it. During the time that Mr. Hughes was on the ground, Officer Higgins and Sergeant Webster utilized their tasers in drive-stun mode eight times over a period of 47 seconds. During the entire incident, Mr. Hughes received an electrical current from the responding officers' tasers a total of twelve separate times.

At some point, the officers were finally able to bring Mr. Hughes under control and, through the utilization of three pairs of handcuffs to secure his arms behind his back and a pair of shackles to stop him from kicking his legs, fully restrained him on the ground. After this occurred, the officers attempted to clean a laceration on Mr. Hughes's hand, and Sergeant Webster performed a pat-down. In Mr. Hughes's pockets, the officers found a handgun with a live round in the chamber, a speed loader, three magazines loaded with bullets, three boxes of ammunition, assorted loose bullets, and a knife. Although Mr. Hughes would not respond to the officers' questions, he was conscious, breathing, and alert as he was rolled over, patted down, and attended to. However, a short time later, Officer Allen noticed that Mr. Hughes began to exhibit signs of medical distress, and the officers called for an ambulance. Despite attempts at cardiopulmonary resuscitation by both the officers and the responding emergency medical technicians, Mr. Hughes stopped breathing in the ambulance and was pronounced dead at 12:17 p.m. at St. Elizabeth Medical Center in Covington. Charles L. Stephens, M.D. of the Northern Kentucky Regional Medical Examiner's Office, indicated in the autopsy report that Mr. Hughes's cause of death was "a cardiac event, due to myocardial hypertrophy and coronary atherosclerosis. The pattern of circumstances with contributing morbid

6

obesity and hypertrophic heart disease, and the use of electrical stun devices suggests that this death could be assigned to excited delirium syndrome."

Sheffey, as the executor of Mr. Hughes's estate, thereafter filed this civil action against the responding officers, the City of Covington, and a number of unknown officers. Sheffey's amended complaint raised federal claims under 28 U.S.C. § 1983 that responding Officers Bacon, Higgins, and Webster used excessive force against Mr. Hughes in violation of the Fourth Amendment, and that responding Officers Allen and Bohman violated Mr. Hughes's civil rights in failing to intervene in the excessive force used by the other officers. The complaint also raised state-law tort claims against the defendants. The district court, following discovery and the filing of motions for summary judgment by all defendants except the unserved and unidentified "unknown officers" defendants, dismissed the unknown officers pursuant to Federal Rule of Civil Procedure 4(m). The district court also granted summary judgment in favor of the named responding officer defendants on the grounds that it found that no constitutional violation had occurred and that, even if constitutional violations occurred, the officers had all acted in an objectively reasonable manner under the circumstances and thus were entitled to qualified immunity. Finally, the district court granted summary judgment in favor of the City of Covington finding that, even if the responding officers had violated Mr. Hughes's constitutional rights, no genuine issue of material fact existed as to municipal liability.

## II. **Standard of Review**

Sheffey has appealed the district court's decision to grant summary judgment in favor of the responding officers. She has not, however, appealed its decision to dismiss the unidentified

unknown officer defendants. This court previously dismissed her appeal of the district court's grant of summary judgment in favor of the City of Covington. This court reviews the district court's grant of summary judgment to the responding officers *de novo*. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003).

Summary judgment is only appropriate when the moving party shows that "there is no genuine issue as to any material fact, thereby entitling the moving party to judgment as a matter of law." *Id. (*citing *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 709 (6th Cir. 2000)). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. <u>Discussion</u>

Sheffey argues on appeal that the district court erred in finding that the responding officers are entitled to qualified immunity for their actions with regard to the repeated tasings of Mr. Hughes during the above-described incident on December 3, 2008. The responding officers have been sued in their individual capacities in this case pursuant to 42 U.S.C. § 1983. Accordingly, in order to state a claim, Sheffey must both show that the officers (1) acted under color of state law and (2) that they deprived Mr. Hughes of a federal statutory or constitutional right. *See Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (internal citations omitted). Further, in order for these individual

8

defendants to be held liable under § 1983, it is the plaintiff's burden to show that they are not entitled to the protection of qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). Qualified immunity protects individual government officials from liability under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal citations omitted). It is a broad grant of protection, and is "an *immunity from suit* rather than a mere defense to liability." *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original).

Courts determine the application of qualified immunity in claims of excessive force through the two-step analysis delineated in *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394 (6th Cir. 2009). This test requires the plaintiff to prove first, that "the defendant violated a constitutional right," and second, if the plaintiff proves the first element, that "the right was clearly established" at the time of the alleged violation. *Id.* at 400.

Claims of excessive force arising out of investigatory stops or arrests are analyzed under the Fourth Amendment's objective-reasonableness test, which requires courts to analyze the entirety of the circumstances to weigh "the nature and quality" of the force used "against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (internal citations omitted). In order to effectuate this inquiry, the court should pay special attention to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The underlying

intent or motivation of the officer is not relevant to the inquiry, but rather only the objective reasonableness of his actions. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004) (quoting *Graham*, 490 U.S. at 397). All determinations regarding objective reasonableness must be considered from the perspective of the officers at the time of the challenged incident, and cannot be considered "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). The court must also consider the fact that in many circumstances "police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 397.

Based upon its evaluation of the responding officers' actions under *Graham* test, the district court found that no evidence existed on the record to create a genuine issue of material fact with regard to the objective reasonableness of the actions of Officers Bacon, Higgins, and Webster in tasing Mr. Hughes during the incident on December 3, 2008. As such, the district court found that no constitutional violation could be found. On appeal, Sheffey argues that a reasonable jury could find that the actions of these officers were objectively unreasonable under the circumstances, due to Mr. Hughes's mental illness, because the illegal activity being investigated in the stop of Mr. Hughes constituted a misdemeanor under Kentucky law, and because Mr. Hughes's behavior was not violent and did not present a high degree of risk. For the reasons that follow, we find that the district court did not err in concluding that no genuine issue of material fact existed that would allow a reasonable juror to conclude that a constitutional violation occurred.

10

A.      The findings of the district court and analysis under *Graham*

In addressing the reasonableness of the responding officers' actions as to each of the factors delineated in *Graham*, the district court first considered the entire backdrop of the relevant situation. It then, as is required under *Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir. 1996), considered the reasonableness of each of the officer's conduct at each point in the encounter. First, the district court considered the severity of the crime being investigated. As to this consideration, the district court stated that the responding officers were called to investigate whether Mr. Hughes was in violation of K.R.S. § 527.020, Kentucky's concealed-carry law, which makes it a misdemeanor to carry a concealed firearm without a permit.[6] The district court then noted that, while generally a violation of the concealed-carry law does not represent notably severe criminal activity, the totality of the circumstances in this particular case resulted in a serious and immediate threat and danger of violence. Sheffey argues on appeal that the district court erred as to this consideration because, objectively, a violation of K.R.S. § 527.020 is a relatively minor crime, thus cutting against the force used against Mr. Graham.

However, Sheffey's argument in this regard ignores the specific facts of this case, noted by the district court, which created a risk significantly more severe than usual in an investigation of a violation of K.R.S. § 527.020. When the officers located Mr. Hughes, he was in a school zone within a neighborhood containing many residential homes and local businesses. The investigatory stop occurred at roughly 11:00 a.m. on a Wednesday, when the school children at the two

---

[6]The appellees also argue that Mr. Hughes was in violation of 18 U.S.C. § 922(q)(2)(A), which makes illegal the possession of a firearm in a school zone. However, the district court found that no facts were presented to support this assertion, and thus did not consider it.

11

surrounding elementary schools were present in the schools. While the officers were informed that Mr. Hughes had removed the clip from the handgun in his possession, they were unaware of whether or not the firearm was loaded. Accordingly, it is clear that, even if violations of K.R.S. § 527.020 cannot reasonably be described as severe criminal activity, the surrounding location, coupled with the information received by the responding officers regarding Mr. Hughes's suspicious behavior and the very fact that he possessed both a firearm and ammunition, created at least the strong possibility of a serious and immediate safety concern from the time that the officers first located Mr. Hughes.

The district court also noted additional considerations regarding the background of the situation in question. Adding to the circumstances creating a reasonable concern regarding an immediate and serious threat was the fact that, upon first contact with Mr. Hughes, it became clear that he, an objectively large man at six feet six inches tall and roughly 410 pounds, was responding to the police interaction in an abnormal way, and that he was not compliant with officer commands. Additionally, in response to the officers' commands, Mr. Hughes continually reached for his waistband, where officers believed a firearm to be located, eventually attempted to flee, and also violently resisted arrest.

### 1. The conduct of Officers Bacon, Higgins, and Webster

The district court then analyzed the conduct of each of the individual officers, beginning with Officer Bacon. Officer Bacon twice tased Mr. Hughes as he either attempted to flee or walked toward Officer Bacon in a menacing fashion. The court found, and we agree that, considering the circumstances surrounding Officer Bacon's initial deployment of his taser, he reasonably believed himself and others to be in danger of an armed Mr. Hughes as he approached and attempted to evade

12

arrest. Officer Bacon thus reasonably deployed the less-than-lethal taser in probe mode. Further, based upon the officers' taser training, which taught them that a taser successfully utilized in probe mode would cause neuromuscular paralysis, Officer Bacon reasonably believed that his taser did not have proper connectivity upon his first attempt because Mr. Hughes did not so react. Accordingly, Officer Bacon's second attempt to tase Mr. Hughes was also reasonable in nature. Sheffey does not raise any particularized objections to the district court's findings as to Officer Bacon's actions, and we believe these findings to be correct.

So, too, did the district court properly find that Officer Higgins acted reasonably when he twice deployed his taser in probe mode into Mr. Hughes's back following the failure of Officer Bacon's attempts to successfully tase Mr. Hughes. After viewing what, based upon his training, appeared to be the failure of Officer Bacon's taser, Officer Higgins observed Mr. Hughes continue to ignore the other officers' commands, move his hands around his waistband, and attempt to flee. He also witnessed Mr. Hughes reach into his pocket, where the officer believed a weapon to be located, and throw a white object toward Officer Allen. Only after observing all of these things, and unaware at that point that Officer Bacon was cycling his taser in a second attempt to subdue Mr. Hughes, did Officer Higgins fire his taser at Mr. Hughes. Then, again reasonably believing his taser to have malfunctioned due to Mr. Hughes's continued resistence and failure to exhibit signs of neuromuscular paralysis, Officer Higgins attempted a second time to deploy his taser. As a result of Mr. Hughes's continued threatening behavior and the reasonable belief that the tasers had all failed to connect properly, we find that the district court was correct in concluding that Officer

13

Higgins had acted in an objectively reasonable manner as to his two attempts to utilize his taser in probe mode.[7]

The district court then turned to the reasonableness of Officer Higgins's use of his taser in drive-stun mode a total of four times after Officers Allen, Bacon, and Bohman took Mr. Hughes to the ground and as they struggled to subdue him. After Mr. Hughes had been forced to the ground in an attempt by Officers Allen, Bacon, and Bohman to avoid what appeared to be escalating into a lethal force situation, Officer Higgins witnessed Mr. Hughes physically and violently resist the officers' attempts to get his hands behind his back. Mr. Hughes even attempted to bite Officer Bacon's hand during the struggle. During the first forty-five seconds of this struggle, Officer Higgins utilized his taser in drive-stun mode twice on top of Mr. Hughes's clothing and twice below the clothing. Again, the district court properly found that, based upon his taser training, Officer Higgins reasonably believed that Mr. Hughes's thick clothing was preventing the taser from making contact with the skin when he used the device twice above the clothing. Then, seeing a chance to get a better connection directly to Mr. Hughes's skin, Officer Higgins reasonably attempted two more times, in quick succession, to successfully utilize the taser to aid in subduing Mr. Hughes. When this failed, Officer Higgins abandoned the use of the taser and moved on. As the district court noted, there is no allegation that any officer used a taser after Mr. Hughes had been subdued. Rather, Officer Higgins and all of the other officers tased Mr. Hughes only during the struggle to bring him under control. Further, when Officer Higgins realized that, despite a proper connection,

---

[7]As with the actions of Officer Bacon, Sheffey fails to offer any particularized objections to these findings.

14

Mr. Hughes was not reacting to the taser, he ceased its use. Accordingly, all of Officer Higgins's actions were objectively reasonable.

Finally, the district court considered Sergeant Webster's deployment of his taser in drive-stun mode a total of four times. Like the drive-stun tasings employed by Officer Higgins, Sergeant Webster's four attempts to tase Mr. Hughes took place in quick succession and were the result of Sergeant Webster's reasonable belief that his taser was failing to make a good connection with Mr. Hughes's body. Unlike Officer Higgins, Sergeant Webster immediately observed that the previous attempts to tase Mr. Hughes were likely unsuccessful due to Mr. Hughes's thick clothing. Accordingly, he immediately lifted Mr. Hughes's shirt and attempted to tase his lower back directly. After that failed, he attempted a second time to tase Mr. Hughes in the hip, but lost connection when Mr. Hughes grabbed Sergeant Webster's hand. The third attempt to tase Mr. Hughes also lost connection due to the movement during the struggle, and the final attempt succeeded at making a connection with Mr. Hughes's skin, but failed to elicit a response. At that time, Sergeant Webster abandoned the use of his taser. Based upon these circumstances, and the ongoing violent resistence of Mr. Hughes throughout all four of Sergeant Webster's attempts to subdue him through the use of the taser, it is clear that Sergeant Webster's actions were also objectively reasonable.[8]

On appeal, Sheffey argues that the tasings that occurred when Mr. Hughes was on the ground could be found to be unreasonable because, once all of the officers had arrived and Mr. Hughes was on the ground, the threat, and thus the governmental interest at stake, lessened significantly. She

---

[8]On appeal, Sheffey argues that Sergeant Webster can also be held liable here under supervisor liability because he failed to instruct Officer Higgins to stop using his taser. However, the district court did not address this argument, and liability under this theory could only attach if Officer Higgins is found to have violated Mr. Hughes's rights.

asserts that the officers should have then considered less intrusive alternatives to tasing Mr. Hughes. Sheffey cites *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), and *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), in support of this argument. However, Sheffey's argument in this regard ignores the unique facts of this case and is based upon general statements of law made in factually dissimilar cases.

In *Cyrus*, the United States Court of Appeals for the Seventh Circuit found that, while the subject arrestee would not allow his hands to be handcuffed when officers attempted to arrest him, he had not violently resisted and that "once Cyrus was on the ground, unarmed, and apparently unable to stand up on his own, the risk calculus changed." 624 F.3d at 862-63. This is not the case here, where Mr. Hughes violently resisted arrest, and continually attempted to stand up after being taken to the ground. Mr. Hughes also remained armed when he was on the ground, and continued to reach for his waistband throughout the struggle. Further, the simple fact that more officers had arrived at the scene does not on its own demonstrate a lowered threat level–especially when considering the size of Mr. Hughes and the level of resistance that he continued to offer throughout the entire struggle, even when four officers were physically attempting to restrain him.

In *Bryan*, the United States Court of Appeals for the Ninth Circuit indicated that arresting officers have a duty to consider all less intrusive alternatives prior to utilizing more intrusive ones. 630 F.3d 805. While Sheffey cites this case and argues generally that the officers failed to consider such less intrusive alternatives, it seems that the officers did just that in choosing to take Mr. Hughes to the ground and to tase him, rather than allowing the situation to reach a level that would have required obviously lethal force. At oral argument, Sheffey argued that the officers could have

16

simply wrestled with Mr. Hughes until they brought him into compliance rather than tasing him after he was brought to the ground. However, Sheffey does not offer any evidence or argument regarding the effectiveness of this option, nor does she respond to the aggravating circumstances present here, including the level of Mr. Hughes's resistance after he was taken to the ground, and the fact that he was reasonably considered to be in possession of, and actively reaching for, a firearm.

### 2.    The conduct of Officers Allen and Bohman

With regard to the failure of Officers Allen and Bohman to intervene, the district court noted that, in order to make a claim for excessive force in failure to intervene, Sheffey must show that the officers both (1) "observed or had reason to know that excessive force would be or was being used, and (2) . . . had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The district court did not consider Officer Bacon's deployment of his taser in its analysis as to the non-intervention of Officers Allen and Bohman because Officer Bacon's use of his taser at a time when Mr. Hughes was entirely unsecured, noncompliant, and attempting to flee, was "certainly justified." However, for purposes of its analysis of the actions of Officers Allen and Bohman, the court assumed, for the sake of argument, that Officer Higgins and Sergeant Webster's actions constituted excessive force.

The district court then found that, due to the confusion, speed, and stress of the situation in question, Sheffey had failed to present evidence to suggest that Officer Allen or Officer Bohman had seen or had reason to know of the actions of Officer Higgins and Sergeant Webster, or that either of the officers had an opportunity or the means to prevent the same. First, as to Officer Higgins's initial two probe tasings, the record shows that both Officers Allen and Bohman were in the process

17

of attempting to take Mr. Hughes to the ground at the time, and that Officer Higgins was located behind Mr. Hughes when he shot his taser, while the other officers were in front of Mr. Hughes. Even if Officers Allen and Bohman had seen Officer Higgins shoot his taser, they would not have been able to stop him due to their location on the other side of Mr. Hughes. Sheffey has also failed to show that Officers Allen and Bohman were aware of, or in the position to prevent, the tasings that occurred while Mr. Hughes was on the ground. The record evidence clearly shows that both officers were actively involved in the struggle to bring Mr. Hughes under control at that time and that their solitary focus, at that time, was achieving that goal. Both Officers Allen and Bohman testified that they did not see anyone tase Mr. Hughes while he was on the ground, and while Officer Allen remembered Officer Bacon saying that Mr. Hughes had been tased,[9] Officer Allen was too focused on the task at hand to notice what the other officers were doing. The physical struggle to bring Mr. Hughes under control also would have kept Officers Allen and Bohman from preventing the tasings, as they were otherwise engaged at the time.

On appeal, Sheffey argues generally that the officers were present for the tasings and that they were located close to each of the tasing officers at the time that the tasings occurred. However, she does not take into account the struggle taking place between the officers and Mr. Hughes at the time, nor does she consider how quickly the tasings occurred. Accordingly, we will affirm the district court as to the liability of Officers Allen and Bohman as well.

---

[9]During the struggle on the ground, Officer Bacon was tased either in the arm or in the hand.

18

B.      <u>Mr. Hughes's mental illness</u>

Rather than addressing the district court's analysis of the *Graham* factors, Sheffey focuses a substantial portion of her argument on appeal discussing her position that the reasonableness of the responding officers' actions in this case must be considered with an eye to Mr. Hughes's mental disability. She argues that, based upon the behavior of Mr. Hughes at the arrival of Officer Allen, the testimony of the officers regarding their perception of Mr. Hughes's behavior, and Officer Allen's radioing that Mr. Hughes may be mentally disturbed, "the record establishes that the officers who came upon Leroy knew, prior to any use of force, that Leroy was experiencing some sort of mental or emotional illness." Appellant's Br. *20. Sheffey maintains that, as a result of Mr. Hughes's mental disability, the responding officers handled the situation inappropriately.

Sheffey asserts that because Mr. Hughes was mentally disturbed, and because he was only passively resisting, the officers erred in their commands to him. Sheffey claims that the officers issued conflicting commands, both when Officers Bacon and Allen approached Mr. Hughes initially, and again after Mr. Hughes was taken to the ground. Accordingly, she argues, the officers misperceived Mr. Hughes's level of resistance, when proper handling of the situation would have allowed Mr. Hughes a better chance to comply. Sheffey presents two cases that suggest that officers who use force to arrest mentally ill individuals who are only passively resisting arrest can be found to have utilized excessive force. *See Bryan*, 630 F.3d 805; and *Cyrus*, 624 F.3d at 862-63.

However, Sheffey's argument in this regard is without merit. Initially, while Sheffey argues that the officers were issuing conflicting commands, the record belies this assertion. It is clear that throughout the initial confrontation with Mr. Hughes, Officers Allen and Bacon commanded him

to (1) raise his hands and (2) get onto the ground. R. 46, Allen Dep. *33-34 and R. 47, Bacon Dep. *51, *54-55. Then, after Mr. Hughes had been taken to the ground, he was given commands to (1) stop resisting and (2) give me your hands. R. 47, Bacon Dep. *64. While Sheffey states that these commands are conflicting, she provides no support for this argument, and it seems that, in fact, these commands are entirely consistent with one another, and are indeed routine commands given by officers in attempting to take an individual into custody. Further, the record belies Sheffey's argument that Mr. Hughes was only passively resisting the responding officers' commands. Beyond the fact that Mr. Hughes continually moved his arms around his waistband, where officers correctly believed him to have placed a firearm, he attempted to flee when approached by Officers Allen and Bacon, and he also physically resisted arrest when he was taken to the ground after attempting to flee. There is even unchallenged deposition testimony that Mr. Hughes attempted to bite Officer Bacon in the struggle to handcuff Mr. Hughes.

It is also important to note that, while it is true that the officers perceived Mr. Hughes as having an abnormal reaction to their commands, and that Officer Allen believed him to possibly be mentally disturbed, Sheffey neglects to explain how any of the officers present could have been aware of Mr. Hughes's actual mental disability. It is undisputed that they received no report positively identifying Mr. Hughes, or warning them of his mental disability. Further, while it was perceived that Mr. Hughes *may* have been mentally disturbed based upon his behavior, the officers testified that it was equally possible that he was intoxicated or, according to Officer Bacon, deaf. As the reasonableness considerations mandated by *Graham* which require this court to determine reasonableness from the perspective of the officers at the time of the arrest, it appears that the actual

20

mental illness of Mr. Hughes cannot be considered except to the extent that it seemed that he *could* have been mentally disturbed. Sheffey does not address this, and does not provide any citation to cases which would aid this court in determining how Mr. Hughes's possibly being mentally disturbed should have affected the officers' behavior.

Further, Sheffey offers no argument as to how the officers should have acted differently given Mr. Hughes's mental illness, or what a reasonable amount of force would have been as a result of the same. Sheffey presents a number of case citations which represent situations where officers have been found to have used excessive force against people with mental illness, but each of these cases are factually dissimilar to this case, and are thus unpersuasive. Initially, in nearly all of the cases cited, the arresting officer or officers knew of the arrestee's mental disabilities with certainty prior to the incident. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of [his] autism and his unresponsiveness."); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003) (Detainee's fiancé requested that police take detainee into custody for his own safety because he had run out of medication for his bipolar disorder and schizophrenia "and was hallucinating and paranoid."); *Deorle v. Rutherford*, 272 F.3d 1272, 1276 (9th Cir. 2001) (Detainee's wife called police for help after suicidal husband had mixed medication, vodka, and Interferon, and was behaving erratically, "screaming and banging on the walls" of his home.). Additionally, in most of these cases, the courts stressed that the arrestee was known to be unarmed and, in each of the cases, the arrestee had not physically resisted or attacked officers or others. *Champion*, 380 F.3d at 904

21

("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted."); *Drummond*, 343 F.3d at 1054 (Arrestee was known to be unarmed, and did not physically resist when officers sat on him, restricting his breathing.);[10] *Deorle*, 272 F.3d at 1282-83 ("The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual . . . are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal . . . ."); *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994) (no evidence that arrestee physically resisted); *McKinney v. DeKalb County,* 997 F.2d 1440 (11th Cir. 1993) (question of fact as to whether arrestee, a disturbed teenager, was still armed with a knife or had threatened the safety of others at the time that he was shot).[11]

Essentially, in each of the cited cases, while the reviewing court took the mental illness of the arrestee into account, the totality of the circumstances was considered with regard to the reasonableness of the force utilized by the arresting officers. We acknowledge that, pursuant to *Champion*, the mental illness of Mr. Hughes should be considered to some extent, but it also appears clear that the district court did consider this from the viewpoint of what the officers knew and could perceive at that time of the incident. The officers' actions cannot be said to be unreasonable based upon the mental illness or perceived mental disturbance of Mr. Hughes, due to the fact that Mr. Hughes was known to be armed in a school zone with children present, that he consistently acted

---

[10]It is also helpful to note that the court in *Drummond* considered the fact that the arrestee weighed 160 pounds at the time of the incident in question, and the arresting officer weighed roughly 220 pounds. In this case, as discussed above, Mr. Hughes was a six-foot-six-inch, 410-pound man on the day of the incident in question.

[11]Sheffey recognizes that, in this case, the officers believed Mr. Hughes to be armed. However, she argues that they had only received reports to this end, and had not actually seen the weapon. The district court found this argument to be unpersuasive because reports of an armed individual create a reasonable circumstance for officers to treat that individual as armed and dangerous.

22

as if he was reaching for his waistband, that he attempted to flee the area, and also that he violently physically resisted arrest.

## IV.  Conclusion

For the foregoing reasons, the district court's grant of summary judgment in favor of the responding officers is AFFIRMED.

**BERNICE BOUIE DONALD, Circuit Judge, dissenting.** Let us recall, for a moment, that a man is dead; that the cause of his death was the use of "electrical stun devices," or tasers, by three different officers, at twelve different times, in five undifferentiated minutes. Recall that eight of those times occurred in less than one minute and that one officer alone used his taser on the man six times. Neither the two officers who originally joined that officer, nor the two others who later arrived, interceded on the man's behalf. Recall further that the man was fifty-two years old.

Let us consider that the deceased was mentally ill; that he had lived alone in Covington, Kentucky for twenty-five years with no arrests, indictments, or convictions. Consider that in responding to a 911 call about his unusual behavior, police officers failed even to notice the deceased, much less to register him as a threat, and drove benignly by him without stopping despite his six-foot, six-inch, four-hundred-pound frame. Only after a second call did police officers finally search out, repeatedly shock, and forcefully subdue Leroy Hughes. The suspected crime that precipitated their conduct was a misdemeanor.

Let us bear in mind that when police officers encountered Leroy Hughes, he did not appear armed—the misdemeanor at issue was, after all, concealment. Yet upon encountering him, the officers asked no questions. Instead, the encounter that ended in a man's death began with an order to get on the ground, issued by an officer crouching behind a car door with his gun drawn. Bear in mind that only after officers had delivered more than 14, 400 volts to his body,[1] driven him to the

---

[1]The officers' expert, Michael Brave Bates, reported that "[t]he peak voltage delivered to the body [by a single use of the tasers at issue] is about 1,200 volts[.]" (R. 54-1, Brave Report, Nov. 10, 2008, at 11, Bates No. 000055.)

ground, and shackled his arms and legs did they "sp[eak] to [Leroy] Hughes in an effort to find out his name and other identifying information[.]" (Appellee Br. at 23.)

Let us acknowledge the obvious tension between the inference that Leroy Hughes sought to flee and the fact that he "took several fast-paced steps" *toward* one of the officers. (Appellee Br. at 16.) Even assuming that Leroy Hughes sought to flee, quickness was not likely a defining characteristic of his six-foot, six-inch, four-hundred-pound frame. Acknowledge the irony in the representation that Leroy Hughes "violently resisted arrest" when he had not fully turned to view the second officer who shocked him before he was tackled by two or three others. Acknowledge further that his lone attempt to use any of the ordnance later recovered from his pockets—a handgun, a speed loader, four magazines, two boxes of ammunition, assorted loose bullets, and a knife—came after the first two of the twelve taser shocks and consisted of his throwing a box of ammunition at an officer as he stated that the handgun was not loaded.

As the majority recounts, we are charged by the Supreme Court to consider three factors in assessing claims of excessive force that arise from investigatory stops or arrests: (1) the severity of the crime at issue; (2) whether the claimant posed an immediate threat of safety to the officers or others; and (3) whether the claimant actively resisted arrest or attempted to flee. *Graham v. Connor*, 490 U.S. 386, 396 (1969). The dispositive inquiry, however, is "whether the totality of the circumstances justified [the] particular sort of search or seizure" that is alleged to have violated the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). If we recall, consider, bear in mind, and acknowledge the totality of the circumstances that led to the death of Leroy Hughes, we

25

cannot fail to recognize that it is error to affirm the grant of summary judgment in favor of the officers who seized him.

We who sit in relative safety behind a bench, garbed in black robes and guarded by federal marshals and county sheriffs sworn to protect us, must never forget "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation." *Graham*, 490 U.S. at 397. That Leroy Hughes was allegedly armed, mentally ill, and in the vicinity of two elementary schools is a searing indictment in an age framed by horrific tragedies in Aurora and Columbine, Colorado; Tucson, Arizona; and Newtown, Connecticut.[2] And combined with his uncommonly large size and continuous reaching toward his waistband, it is little wonder that police officers found it necessary to intervene. Less clear, however, is whether the officers' chosen intervention, which resulted in the death of Leroy Hughes, was *reasonable*.[3]

---

[2] *See* Dan Frosch & Kirk Johnson, *Gunman Kills 12 in Colorado, Reviving Gun Debate*, N.Y. Times, July 20, 2012, http://www.nytimes.com/2012/07/21/us/shooting-at-colorado-theater-showing-batman-movie.html?pagewanted=all; Shailagh Murray & Sari Horwitz, *Rep. Gabrielle Giffords Shot in Tucson Rampage; Federal Judge Killed*, Wash. Post, Jan. 9, 2011, http://washingtonpost.com/wp-dyn/content/article/2011/01/08/AR2011010802422.html; James Barron, *Nation Reels After Gunman Massacres 20 Children at School in Connecticut*, N.Y. Times, Dec. 14, 2012, http://nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html?pagewanted=all.

[3] As the Supreme Court has explained, only after "the relevant set of facts is determined and all reasonable inferences are drawn *in favor of the plaintiff*, to the extent supported by the record," does objective reasonableness become a question of law. *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting, *inter alia*, *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007) (emphasis added)); *cf. Muehler v. Mena*, 544 U.S. 93, 108 (2005) (Stevens, J., concurring) ("Under *Graham* [*v. Connor, supra*, 490 U.S. at 396], the *trier of fact* must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' [sic] against the countervailing governmental interest at stake.'" (Emphasis added.)). Here, a number of inferences appear to have been drawn *against* Leroy Hughes.

For as much as the deaths in Colorado, Arizona, and Connecticut thread the tapestry of rapidly evolving circumstances that police officers must consider, so, too, do the deaths of Amadou Diallo,[4] Sean Bell,[5] Oscar Grant,[6] and Jonathan Ferrell.[7]  And while a hundred reasonable arrests may go unmentioned for every egregious exception, we cannot ignore the seeds of systemic inequalities sown in our Nation's history and lain bare by diligent review.  *See, e.g., Floyd v. City of New York*, No. 08 Civ. 1034, 2013 U.S. Dist. LEXIS 113271 (S.D.N.Y. Aug. 12, 2013) (Scheindlin, J.), *stayed by Ligon v. City of New York*, Nos. 13-3123 / 3088, 2013 U.S. App. LEXIS 22229 (2d Cir. Oct. 31, 2013).  Nor can we fail to mourn the bitter fruit those seeds have spawned,[8] even as we strive to root it out.

Leroy Hughes may have been confused, due to his schizophrenia, rather than resistant or non-compliant.  This is a factor that the trier of fact must weigh along with all the other evidence. *See Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)) ("[U]nder our precedent it is unreasonable

---

[4]*See* Michael Cooper, *Officers in Bronx Fire 41 Shots, and an Unarmed Man Is Killed*, N.Y. Times, Feb. 5, 1999, http://www.nytimes.com/1999/02/05/nyregion/officers-in-bronx-fire-41-shots-and-an-unarmed-man-is-killed.html.

[5]*See Cop in 50-Shot Killing of Unarmed Sean Bell to Be Fired*, N.Y. Post, Mar. 24, 2012, http://nypost.com/2012/03/24/cop-in-50-shot-killing-of-unarmed-sean-bell-to-be-fired/; *see also*
David W. Chen & Al Baker, *New York to Pay $7 Million for Sean Bell Shooting*, N.Y. Times, July 27, 2010, http://www.nytimes.com/2010/07/28/nyregion/28bell.html?ref=seanbell.

[6]*See* Jesse McKinley, *Officer Guilty in Killing That Inflamed Oakland*, N.Y. Times, July 8, 2010, http://www.nytimes.com/2010/07/09/us/09verdict.html; *see also Fruitvale Station* (Significant Productions & OG Project 2013) (film about Grant's death).

[7]*See* Kim Severson, *Asking for Help, Then Killed by an Officer's Barrage*, N.Y. Times, Sept. 16, 2013, http://www.nytimes.com/2013/09/17/us/asking-for-help-then-killed-by-an-officers-barrage.html?_r=0.

[8]*E.g.,* Lizette Alvarez & Cara Buckley, *Zimmerman Is Acquitted in Trayvon Martin Killing*, N.Y. Times, July 13, 2014, http://www.nytimes.com/2013/07/14/us/george-zimmerman-verdict-trayvon-martin.html?pagewanted=all; Mary C. Curtis, *No Justice for Jordan Davis, More Worry for Parents of Black Children*, Wash. Post (Feb. 17, 2014, 12:33 PM), http://www.washingtonpost.com/blogs/she-the-people/wp/2014/02/17/no-justice-for-jordan-davis-more-worry-for-parents-of-black-children/.

to tase a nonresisting suspect."). When confronted by police, Leroy Hughes, who moved toward, rather than away from, an arresting officer, may or may not have attempted to flee. Although Leroy Hughes carried considerable concealed ordnance, he neither threatened nor attempted to use it. And any violence attributable to Leroy Hughes appears to have been precipitated by, rather than having provided a reason for, the use of force against him. But Leroy Hughes is dead.

Whatever actually happened on December 3, 2008, the determination of the facts on which the reasonableness of the police officers' conduct in this case depends is reserved for the jury, as the finder of fact. *See, e.g., Vetters v. Berry*, 575 F.3d 90, 95 (6th Cir. 1978) ("When the evidence is in dispute it is singularly within the province of the jury to decide which version of the facts is to be accepted." (Citation and internal quotation marks omitted)). And even assuming a definite set of facts, until all inferences have been drawn in favor of Leroy Hughes, whether the officers' conduct was reasonable remains, itself, a material question of fact. *See Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting, *inter alia*, *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). My colleagues in the majority fail to respect the role that the jury should play in this matter and, consequently, endorse the usurpation of that role in the face of genuine issues of material fact. Because I cannot reconcile such an endorsement with the distinct roles of the trial judge and the jury, I respectfully dissent.