RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARY STEWART, as Administrator of the Estate of
Luke O. Stewart, Sr., Deceased,

*Plaintiff-Appellant*,

*v.*

No. 18-3767

CITY OF EUCLID, OHIO; MATTHEW RHODES, Euclid
Police Officer,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cv-02122—James S. Gwin, District Judge.

Argued: May 8, 2019

Decided and Filed: August 14, 2020

Before: SILER, GIBBONS, and DONALD, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Jacqueline Greene, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellant.
Frank H. Scialdone, MAZANEC, RASKIN & RYDER, CO., L.P.A., Cleveland, Ohio, for
Appellees. **ON BRIEF:** Jacqueline Greene, Sarah Gelsomino, Terry H. Gilbert, FRIEDMAN &
GILBERT, Cleveland, Ohio, for Appellant. Frank H. Scialdone, James A. Climer, MAZANEC,
RASKIN & RYDER, CO., L.P.A., Cleveland, Ohio, for Appellees.

SILER, J., delivered the opinion of the court in which GIBBONS, J., joined. DONALD,
J. (pp. 15–24), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

SILER, Circuit Judge.   Plaintiff Mary Stewart appeals the district court's grant of summary judgment to defendants, Officer Matthew Rhodes and the City of Euclid, on her claims brought pursuant to 42 U.S.C. § 1983 and state law.  We **AFFIRM** dismissal of Stewart's federal claims but **REVERSE** dismissal of Stewart's state law claims and **REMAND** to the district court.

**FACTUAL HISTORY**

Around 7:00 a.m. on March 13, 2017, a Euclid, Ohio resident called the police department to report a suspicious vehicle outside her residence.  The caller said a black car she did not recognize had been idling for about twenty minutes with its parking lights on.  Officers Rhodes and Catalani were dispatched to check on the vehicle.

Hidden from view behind the Honda's dark windows was a sleeping Luke Stewart.  He had hoped to spend the night at a friend's house, but when the friend did not answer his phone, Stewart parked nearby on South Lakeshore Boulevard.  The area is residential with a school in close proximity.

Officer Catalani was the first to arrive at the scene.  Initially, he positioned his car behind Stewart's vehicle, similar to a traffic stop.  Catalani noticed the vehicle's running lights were on.

Catalani shined his flashlight through the car's windows and saw a digital scale in the center console area, an item he thought to be a burnt marijuana blunt in the passenger seat, and an aluminum screw top he believed to be from a wine bottle.  Catalani also noticed Stewart who appeared asleep in the driver's seat.  Catalani ran the license plate of the vehicle, which indicated the vehicle's owner had an outstanding warrant, but ultimately thought Stewart looked too young to be the owner.

While Rhodes drove to the scene, he heard Catalani radio that the car was occupied but that he did not believe it was by the vehicle's owner.  Catalani stated, "once you get here, we're

goina [*sic*], uh, end up pulling this guy out." When Rhodes arrived, Catalani explained what he had seen inside the car, and then Rhodes moved his car in front of the Honda to limit the potential for escape. Rhodes turned on his takedown lights and his spotlight but, like Catalani, did not turn on his vehicle's dashboard camera or his belt microphone. Neither officer turned on his vehicle's blue and red overhead lights.

Rhodes approached Stewart's vehicle from the passenger's side while Catalani approached from the driver's side. Catalani knocked on the window, and Stewart woke up. Catalani waived at Stewart and said, "hi." Stewart waived back, sat up in the seat, and started the car. Neither officer announced himself as a police officer. Catalani yelled for Stewart to "stop" and opened the driver's side door in an attempt to keep the vehicle from moving. He grabbed Stewart's left arm and tried to pull him away from the gearshift and out of the vehicle. Catalani reached around Stewart's head with his right arm in an attempt to grab a pressure point under Stewart's jaw. Stewart began yelling.

While Catalani attempted to pull Stewart out of the Honda through the driver's side door, Rhodes opened the passenger's side door and began pushing Stewart. Rhodes leaned his upper body into the vehicle and braced his knees on the passenger's seat. Stewart did not prevent Rhodes from pushing him, but put the vehicle into gear and drove the Honda into Rhodes's patrol vehicle. While Catalani testified that the Honda struck the patrol car "pretty hard," neither officer remembers falling or losing balance from the impact. Stewart was able to drive around Rhodes's police car on the side closest to the center of the road.

Rhodes continued trying to gain control of the gear shift from the passenger's side of the car and, fearing his legs would be trapped if Stewart were to hit the open car door against Rhodes's patrol car as he went around it, Rhodes pulled his legs into the Honda. The door shut behind him. Catalani, who was still moving alongside Stewart's open driver's side door, decided to disengage with Stewart in fear of being injured by an oncoming vehicle. Catalani estimates that ten to fifteen seconds elapsed from the time he tapped on Stewart's window to Stewart's driving around Rhodes's patrol car.

To this point, Stewart had made no attempt to strike either officer.  He began driving the vehicle down the road within the speed limit at around twenty-five miles per hour.  While driving, Stewart looked over at Rhodes and asked, "Why are you in my car?"  Rhodes yelled at Stewart in response, but does not recall what he said.  Catalani chased behind on foot.

Inside the car, Rhodes was intermittently attempting to gain control of the gearshift and the ignition keys while also striking Stewart in the side of the head with a closed fist.  The strikes did not seem to have any effect on Stewart and he did not try to defend himself; Stewart simply responded to each blow by saying, "Naw, n****."  Each time Rhodes pushed the gearshift into neutral, Stewart pushed it back into drive.

Rhodes eventually deployed his taser into Stewart's right side.  Stewart shouted "Ah," and said, "you shot me."  Rhodes pulled the taser trigger six times, but it had little effect on Stewart.  He did not use the taser's close range drive stun feature; Rhodes did, however, use the taser to hit Stewart in the head causing a cut to open.  Again, Stewart did not respond other than to say, "Naw, n****."

The Honda came to a stop in the intersection of South Lake Shore and East 222nd Street while making a left-hand turn.  Rhodes believed he and Stewart hit another car because of how abruptly Stewart's vehicle stopped.  Catalani testified that the Honda never struck a vehicle, however, and he thought the car simply stalled out.  Rhodes believes he was thrown into the dashboard but does not "remember exactly."  He testified that, during the stop, Stewart swatted at him and pushed him away but not with a closed fist.  Rhodes got the car into neutral and shut off the engine, but could not get the keys out of the ignition.  Rhodes heard dispatch instruct nearby officers to assist.  The car was stopped for approximately ten to fifteen seconds in the intersection; Rhodes did not try to get out of the car.  Moments before Catalani reached the vehicle from behind, Stewart turned the car back on and continued driving.

After completing the turn onto 222nd Street, Stewart drove the car at approximately twenty to thirty miles per hour.  Rhodes unsuccessfully tried again to put the car in park.  The Honda went up over the curb and around a telephone pole before returning to the street.  The car mounted the curb again near the intersection of 222nd Street and Milton Avenue.  Rhodes claims

he was thrown forward the second time the car struck the curb and Stewart used his right arm to push him forward, but Stewart made no attempt to strike Rhodes. At this point, Rhodes was able to get the car back into neutral, but Stewart continued to rev the engine. Rhodes believed that if he and Stewart "went forward again we were going to hit a telephone pole," implying the vehicle had stopped moving forward.

It was then that Rhodes pulled out his pistol and fired two shots into Stewart's torso. Stewart looked at Rhodes, said "Naw, N****," and, according to Rhodes, Stewart attempted to "punch" him for the first time. Rhodes shot Stewart three additional times, striking him in the neck, chest, and wrist. Stewart died from his wounds.

A later investigation by the Ohio Bureau of Criminal Investigation reported that continuous radio traffic showed fifty-nine seconds elapsed from the time Catalani advised dispatch that Stewart began to flee to the time he reported shots fired.

**PROCEDURAL HISTORY**

Mary Stewart, the mother of Luke Stewart, filed a lawsuit on his behalf against Officers Rhodes and Catalani and the City of Euclid. She brought federal claims pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) for violating Stewart's Fourth Amendment right to be free from excessive force. And under Ohio law she claimed: (1) wrongful death; (2) intentional infliction of emotional distress; (3) assault and battery; (4) willful, wanton, and reckless conduct; and (5) survivorship claims against Rhodes and Catalani. This appeal deals only with the claims against Rhodes and the City of Euclid.

The district court found that qualified immunity barred the constitutional claims against Rhodes. It reasoned that Rhodes had probable cause to believe he was in danger of serious physical harm when unsecured in Stewart's car; he was at risk of being kidnapped; and Stewart's driving created a risk of serious physical harm to the public. The district court found the Constitution allowed Rhodes to shoot Stewart to prevent those immediate dangers. Further, even if Rhodes violated Stewart's constitutional rights, it held those rights were not clearly established as required to deny qualified immunity. Stewart's *Monell* claim was dismissed for lack of a

constitutional violation, and the district court found Rhodes was entitled to immunity under Ohio law.

**STANDARD OF REVIEW**

We review a district court's grant of summary judgment de novo. *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017). All facts and related inferences are viewed in the light most favorable to the non-moving party. *Godawa v. Byrd*, 798 F.3d 457, 462 (6th Cir. 2015).

**DISCUSSION**

**I.      42 U.S.C. § 1983 Claim Against Officer Rhodes**

Qualified immunity shields an officer from liability "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity thus entails two steps that can be undertaken in any order: (1) whether the public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events. *Godawa*, 798 F.3d at 462-63 (citation omitted).

          *a.  Constitutional Violation*

The Fourth Amendment to the United States Constitution protects against unreasonable seizures, which includes excessive force by law enforcement officers. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). Shooting Stewart is a seizure under the Fourth Amendment. *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Thus, to be constitutional, it must be reasonable.

The reasonableness of a seizure depends on context: officers may use "some degree of physical coercion or threat" to effect an arrest, but the amount of force must be objectively reasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Important considerations for determining reasonableness include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* In

deadly force cases, the most critical factor is the immediate danger to officers and members of the public in the area. *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014). Where an officer has probable cause to believe the suspect poses such a threat of serious physical harm, "it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11.

The circumstances, and their totality, are considered as they would have appeared to "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We take care not to "allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

As a threshold issue, it should be noted that Rhodes's choice to enter the vehicle, and his choice not to exit the vehicle when it was stopped for ten to fifteen seconds, is irrelevant in assessing the reasonableness of his use of force. *See Thomas v. City of Columbus, Oh.*, 854 F.3d 361, 365 (6th Cir. 2017) ("We do not scrutinize whether it was reasonable for the officer to create the circumstances" (quoting *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007))).

But having no duty to retreat does not mean Rhodes could use deadly force; his actions must still be reasonable under the circumstances. Here, some of the circumstances support the reasonableness of Rhodes's actions. Stewart drove into a police car at the beginning of the interaction; his vehicle, for whatever reason, unexpectedly stopped in the middle of an intersection; and twice he drove onto a pedestrian sidewalk. All of this occurred at approximately 7:00 a.m. in a residential neighborhood with a school nearby. Stewart certainly presented some danger to the general public in the area.

So too do the circumstances show some danger to Rhodes. He was unsecured in a vehicle doing those things listed above. From the beginning to the end of the interaction, Stewart continued to put the car in drive and rev the engine, showing his commitment to driving the vehicle despite Rhodes's efforts to stop him.

But the question is "whether the *totality* of the circumstances" justifies deadly force. *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8-9). It does not. For one, Stewart was

not aggressive toward Rhodes. The district court pointed out that, "[i]ndeed, Stewart was just driving[.]" Despite being hit by Rhodes's fist and later his taser, Stewart rarely attempted to defend himself. At no point did either officer see a weapon in Stewart's car, much less one that he attempted to use.

And Stewart's driving, while poor, was not so dangerous as to constitute "an immediate threat to the safety of the officers or others." *Id.* The officers estimated that Stewart's car only ever reached speeds of twenty to thirty miles per hour, with the car coming to a stop, or near-stop, twice during the approximately one-minute ride. While Rhodes claims to have feared death or serious injury from being ejected through Stewart's windshield at the time he discharged his gun, the car had previously come to an abrupt halt in the intersection of South Lakeshore Boulevard and East 222nd Street; Rhodes does not remember if he went forward into the dashboard, and certainly did not sustain serious injury. Most importantly, Rhodes admits the car was in neutral at the time of the shooting and, in a light most favorable to the plaintiff, the car was not moving forward.

Even were Stewart to get the car back in gear, it seems doubtful that Stewart's driving alone was threatening enough to justify shooting him.[1] Finding deadly force reasonable to end a car chase often involves "dangerous prior conduct by the driver, imminent risk of harm to an identifiable party, or objective evidence of the driver's intent to harm officers." *Latits*, 878 F.3d at 551; *see Scott v. Harris*, 550 U.S. 372, 375-76 (2007) (driver exceeded 85 miles per hour on a two-lane road, running multiple red lights, swerving around more than a dozen cars, and forcing other vehicles off the roadway); *Freland*, 954 F.2d at 347 (driver led police on a "wild chase" exceeding speeds of 90 miles per hour).

Here, Stewart went up on the curb twice at low speeds as Rhodes hit and tasered him. While Catalani testified that he disengaged due to an oncoming vehicle, and that there were cars on 222nd Street, he admits there were initially no other cars on the street; neither side has pointed to evidence showing that there were bystanders or pedestrians along Stewart's route.

---

[1]It is true the Sixth Circuit recognizes that a dangerous situation may quickly evolve into a safe one before a police officer has a chance to realize the change. *Cupp*, 430 F.3d at 774-75. But here, it is unclear that Stewart's driving ever presented the type of immediate threat necessary for deadly force.

A jury could find that Stewart's use of the vehicle was not threatening lives around him and thus Rhodes's use of force was unreasonable. *See, e.g.*, *Cupp*, 430 F.3d at 775.

Finally, no reasonable officer in Rhodes's position would believe he was being kidnapped by Stewart. In fact, the circumstances here are the opposite of a kidnapping: Stewart was attempting to flee officers. While Rhodes had no duty to retreat from the vehicle, his entry into the vehicle and the availability of an exit speak to the totality of the circumstances informing his use of deadly force. A reasonable officer in Rhodes's position would have known that it was his own choice, and not any sort of pressure by Stewart, that caused him to enter the car. While these are acts Rhodes was legally entitled to do, a reasonable officer in his position would have understood he was not being kidnapped.

Some of the circumstances in this case suggest that Rhodes's use of deadly force was reasonable. Others—specifically, Stewart's lack of aggression toward Rhodes, the low speeds at which he was driving, and the fact that the car may have been already stopped at the time he was shot—allow a reasonable jury to find facts showing Stewart did not present an immediate danger of serious physical injury and thus the use of deadly force was unreasonable.

### b. Clearly Established

Regardless of whether a constitutional violation occurred, however, the district court was correct to find the contours of the right were not clearly established in these circumstances.

To be "clearly established," existing precedent—either controlling authority or a "robust consensus of cases of persuasive authority"—must have placed the constitutional question "beyond debate." *Latits*, 878 F.3d at 552 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)). The Supreme Court has recently elaborated:

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him . . . . This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality . . . the specificity of the rule is especially important in the Fourth Amendment context . . . . Thus, we have stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.

> While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018).

*Graham* and *Garner* establish the broad proposition that a seizure by law enforcement under the Fourth Amendment must be reasonable, and it is unreasonable to seize a fleeing felon with deadly force when the suspect poses no immediate threat to officers or others.  490 U.S. at 394-96; 571 U.S. at 11.  Other than in the "obvious" case, however, the Supreme Court has indicated these general propositions are "not enough" to delineate the contours of the right—to alert officers to the beginning and end of the right in the particular circumstances they face.  *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).  Given the competing concerns noted earlier, this is not an obvious case.

Stewart has pointed to no cases in this circuit involving an officer being driven in a suspect's car, much less a case that shares similar characteristics such as the suspect's level of speed, aggression, or recklessness.  While it is correct that the Sixth Circuit has established precedent for use of deadly force on those who flee in a vehicle, the two cases cited by Stewart involve officers standing outside a vehicle with wholly different concerns than an officer inside the vehicle.  Those cases primarily focused on whether the officer was at risk of being hit or run over by the vehicle, a threat Rhodes did not face inside Stewart's car.  *See Godawa*, 798 F.3d at 464–67 (finding officer outside a fleeing vehicle would have no fear of being struck given his positioning on the rear passenger's side); *Cupp*, 430 F.3d at 774 (determining that a jury could find an officer outside the fleeing vehicle was never in its path and fired his weapon after the vehicle had passed and thus was not in immediate danger).  Put simply: cases about when officers may use deadly force against the driver of a vehicle bearing down on them explain very little about whether that force is appropriate as a passenger of the vehicle.  While plaintiff need not provide a case factually on all fours, existing precedent must be similar enough to place the question beyond debate.  *Wesby*, 138 S. Ct. at 590.  This circuit has not debated the types and

level of threat faced by an officer inside a fleeing suspect's vehicle, much less placed it beyond debate.[2]

Further, Stewart's reference to two out of circuit cases does not provide the "robust consensus" required for the right to be clearly established. *Latits*, 878 F.3d at 552. Neither controlling nor persuasive precedent has clearly established Stewart's rights in the "particular circumstances" Rhodes faced. *Wesby*, 138 S. Ct. at 590. Indeed, few cases have ever considered the danger faced by an officer inside a fleeing suspect's vehicle and at what point it justifies the use of deadly force. Rhodes is entitled to qualified immunity.

## II.    *Monell* Claim Against City of Euclid

The Euclid Police Department's deadly force training program involved inappropriate and tasteless elements. The presentation materials included jokes trivializing the use of force, such as a graphic showing an officer beating a prone and unarmed suspect with the caption "[p]rotecting and serving the poop out of you." The presentation linked to a Chris Rock comedy routine in which Rock repeatedly jokes about police beating citizens on grounds of race and shows clips of officers beating suspects. Even the components of the program that can be stomached appear skimped, such as the single genre of factual scenarios used to test officers.

But Stewart cannot sue the City of Euclid for its distasteful, perhaps inadequate, training program. A municipality may be held liable for the constitutional violations of its employees when the municipality's custom or policy led to the violation. *Monell*, 436 U.S. at 694-95. But "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (internal quotation marks omitted). And "a municipal policymaker cannot

---

[2]While the dissent makes a compelling argument, we think it appropriate to narrowly evaluate the clearly established prong here. Recently, the Supreme Court sharply criticized a circuit for "defin[ing] the qualified immunity inquiry at a high level of generality" in a vehicular flight case. *Mullenix v. Luna*, 136 S. Ct. 305, 311 (2015) (per curiam). *See also District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018). Additionally, in a previous vehicular flight case, the Supreme Court explained that when an officer's "actions fell in the hazy border between excessive and acceptable force," we should hold that his conduct did not violate clearly established law. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (citation omitted). Thus, Supreme Court precedent binds us to taking a narrow approach in analyzing this case.

exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc)). The Sixth Circuit more recently explained:

> When an injury arises directly from a municipal act—such as firing a city official without due process, or ordering police to enter a private business without a warrant, the violated right need not be clearly established because fault and causation obviously belong to the city. But when a municipality's alleged responsibility for a constitutional violation stems from an *employee's* unconstitutional act, the city's failure to prevent the harm must be shown to be deliberate under rigorous requirements of culpability and causation. The violated right in a deliberate-indifference case thus must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear.

*Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994-95 (6th Cir. 2017) (citations omitted) (quoting *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997)).

Here, Stewart's rights were not clearly established in the precedent of this circuit or otherwise. Thus, violation of his rights cannot be the "known or obvious consequence" disregarded by the City of Euclid through its training program and the *Monell* claim fails. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

### III.    Claims Against Officer Rhodes Under State Law

The district court found that Rhodes was entitled to immunity from Stewart's various state law claims for the same reasons it concluded Rhodes did not violate Stewart's constitutional rights. We have rejected that analysis.

Statutory immunity under Ohio law, which applies to state law claims, is distinct from federal qualified immunity. *Roe v. Franklin Cty.*, 673 N.E.2d 172, 181 n.7 (Ohio. Ct. App 1996). Ohio provides statutory immunity from suit to its police officers unless, among other things, the officer's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Reckless conduct is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that

is unreasonable under the circumstances and is substantially greater than negligent conduct." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016).

This court has previously endorsed the view that under Ohio law, "if the trier of fact were to find that [the decedent] posed no immediate threat of harm to anyone else . . . then the officer's actions in shooting the decedent were reckless at best." *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (quoting *Carpenter v. City of Cincinnati*, No. C-1-99-227, 2003 WL 23415143, at *13 (S.D. Ohio Apr. 17, 2003)). And an Ohio appellate court has explained that the "relevant inquiry before the court [is] whether [the officer], from his own perspective, reasonably had probable cause to believe that he [was] at imminent risk of serious physical harm when he fired his weapon." *Hayes v. Columbus*, No. 13AP-695, 2014 WL 2048176, at *11 (Ohio Ct. App. May 15, 2014) (unreported).

As noted previously, a reasonable jury could find facts showing Stewart did not pose an immediate danger of serious physical harm and thus the use of deadly force was unreasonable. And the language of § 2744.03(A)(6)(b) does not appear to require analysis of whether the underlying right has been clearly established in precedent, as does qualified immunity. *See, e.g.*, *Bodager v. Campbell*, No. 12CA828, 2013 WL 5741005, at *5 (Ohio Ct. App. Oct. 7, 2013) (unreported) ("Immunity from state law claims turns not on the federal qualified immunity doctrine, but on R.C. 2744.03(A)(6)"). A jury could find that Rhodes knew firing his gun would cause harm to Stewart and the firing was unreasonable in the circumstances. Thus, Rhodes is not entitled to statutory immunity from the state law claims.

The district court did not consider whether—without immunity from suit—Stewart's various state law claims survive summary judgment. We remand these claims to the district court, which in its discretion may determine whether supplemental jurisdiction should be exercised, *see Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996), and if so, whether the state law claims may proceed to trial.

**CONCLUSION**

We **AFFIRM** dismissal of Stewart's federal claims and **REVERSE** dismissal of Stewart's claims under state law.  The state law claims are **REMANDED** to the district court for disposition consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

BERNICE BOUIE DONALD, concurring in part and dissenting in part. While I agree that the district court should be reversed on the state law claims and that Officer Rhodes violated Luke Stewart's Fourth Amendment right to be free from unreasonable seizures, I would also find that the constitutional right was clearly established and that, therefore, Rhodes is not entitled to qualified immunity. The majority evaluates the clearly-established prong too narrowly and provides immunity to an officer who created a dangerous situation and then used that situation to justify the fatal shooting of a man who did not present an immediate danger of serious physical injury to the officer. In fact, it is debatable whether Stewart presented any danger to the officer or the public, or if he even knew that Rhodes was a law enforcement officer, since neither Rhodes nor Catalani announced themselves as police officers.

**I.**

Despite § 1983's categorical decree that all persons under color of state law who cause the deprivation of a constitutional right "shall" be subject to liability, the Supreme Court overlaid qualified immunity onto the statute's directive in an effort to balance its underlying policies. *Developments in the Law—Section 1983 and Federalism*, 90 Harv. L. Rev. 1135, 1209-17 (1977); *see also Wood v. Strickland*, 420 U.S. 308, 321-22 (1975). More specifically, the doctrine—as we know it today—was deemed necessary to protect public officials from unforeseeable developments in the law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").

Today, the seemingly endless struggle with applying the doctrine is in defining the extent of a clearly established right. *See, e.g.*, *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503-04 (2019). The Supreme Court has explained that defining clearly established rights too broadly—such as "the right to due process of law"—"would destroy the balance that our cases

strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties, by making it impossible for officials reasonably [to] anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks and citation omitted) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984). Accordingly, the Supreme Court demanded that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. On the other hand, concerned that defining rights too narrowly would create *unqualified* immunity, the Supreme Court also explained that its emphasis on particularity "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted).

Judge Willett from the Fifth Circuit recently highlighted some of the issues with the clearly-established standard in his dissent in *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., dissenting). Noting the courts' division over what level of "factual similarity must exist," he wrote that "the 'clearly established' standard is neither clear nor established among our Nation's lower courts." *Id.* He also emphasized that deciding immunity issues based on a too-narrow construction of clearly established law prevents the vindication of constitutional rights:

> Merely proving a constitutional deprivation doesn't cut it; plaintiffs must cite functionally identical precedent that places the legal question "beyond debate" to "every" reasonable officer. . . . This current "yes harm, no foul" imbalance leaves victims violated but not vindicated. Wrongs are not righted, and wrongdoers are not reproached.

*Id.* Of course, the problems do not end there, as courts have increasingly begun to skip the constitutional question and simply ask whether the right was clearly established. *Id.*; *see, e.g.*, *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) ("The [constitutional] question raises some complications. The [clearly established prong] does not. We opt to answer the easier of the two questions, saving the harder one for another day."). This practice leads to perverse results:

Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability.

*Zadeh*, 928 F.3d at 479-80 (Willett, J., dissenting).

Here, the majority answered the constitutional question first but construes the clearly-established prong too narrowly. The sole purpose of the clearly-established prong, as created and announced by the Supreme Court, is to protect officials from unforeseeable or unknowable developments in the law. *Harlow*, 457 U.S. at 818. It is not a blank check to engage in specific acts that have not previously been considered by a court of controlling authority. *Anderson*, 483 U.S. at 640. Nor is it "a license to lawless conduct." *Harlow*, 457 U.S. at 819. When defining clearly established rights, we must have in the forefront of our mind this question: would a reasonable officer have known that his actions were unconstitutional? *See Anderson*, 483 U.S. at 639; *see also District of Columbia. v. Wesby*, 138 S. Ct. 577, 590 (2018) (explaining that defining a right with specificity assists officers who "find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered'" (citation omitted)). Defining the bounds of clearly-established rights too narrowly prevents the vindication of constitutional rights and allows courts to avoid the constitutional question all together because it is "easier." *Hagans*, 695 F.3d at 508.

## II.

At the outset, I note that the Court is left with a one-sided account of the events from the officers' perspective since Rhodes ended Stewart's life. Further, officers did not activate dash cameras, body cameras, or any recording devices upon approaching Stewart because the evidence suggests that they had already determined that they were going to use force to remove him from the car rather than simply asking him to step out of the vehicle. Yet, even with those limitations, the majority and I both conclude that the actions as described were unconstitutional and thus unlawful. Because the qualified immunity inquiry turns on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, rather than the

officer's subjective intent, we must review the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

On the morning of March 13, 2017, Stewart was asleep in his car, lawfully parked on the street. There was no suspicion of or complaint of a suspected crime. A woman simply called police to report that "a creepy" car had been parked on her street for twenty minutes with the engine running.

Catalani made the scene, and with the aid of his flashlight, observed Stewart asleep behind the wheel, a digital scale on the seat, and what appeared to be a wine cap on the floor. Upon running the license plate, Catalani determined there was an outstanding warrant for the owner of the vehicle, but he recognized that Stewart did not fit the owner's description. Catalani radioed another officer—Rhodes—and told him that "once you get here, we're goina [sic], uh, end up pulling this guy out."

Prior to arousing Stewart, the two officers positioned themselves on either side of the car and blocked Stewart's vehicle in with their squad cars. When the officers tapped on the vehicle's window and woke Stewart up, he engaged the engine and maneuvered the car from its position and onto the street, striking one of the police cars in the process. Rhodes hoisted himself into the car, and Catalani began running behind the car. The undisputed testimony of both officers is that Stewart's speed never exceeded 25-30 mph and that he never exceeded the speed limit. While Stewart drove, he asked Rhodes, "Why are you in my car?" As Stewart continued driving forward, Rhodes repeatedly tased Stewart. When this failed to stop Stewart from fleeing, Rhodes resorted to beating Stewart's head with the taser and punching Stewart repeatedly. Notably, Stewart did not respond in kind—he did not physically attack Rhodes, or even attempt to remove Rhodes from the vehicle.

During the encounter, the vehicle came to a full stop at least twice. At one point, the car was stopped long enough for Catalani to almost catch up to the vehicle, yet, during that stop, Rhodes did not display his badge, exit the vehicle, or tell Stewart he was under arrest. During the final stop of this 59-second ordeal, Rhodes, having never identified himself as a police officer, took out his service revolver and shot Luke Stewart. Stewart exhibited no aggression

toward Rhodes until after Rhodes shot him.  Stewart had not tried to strike, punch, or assault him.  Yet, at a time when the vehicle was stopped, Rhodes fired not one, but five shots into the body of Luke Stewart, striking him in the chest, neck, torso, and wrist.

**III.**

Not every threat is sufficient to justify the use of deadly force.  *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-97 (9th Cir. 2014) (en banc).  A court should consider an officer's use of force from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  In *Elder v. Holloway*, the court reflected a permissive view of what authorities can render the law clearly established. 510 U.S. 510 (1994).  Further, a court should use its "full knowledge" of its own and other relevant precedents in determining whether a right is clearly established.  *Id.* at 516 (quoting *Davis*, 468 U.S. at 192 n.9).

In *Godawa v. Byrd*, we held that an officer who shot at a fleeing suspect was not entitled to qualified immunity.  798 F.3d 457, 460 (6th Cir. 2015).  The facts in this case do not change that analysis where an officer, against department policy, places himself inside a misdemeanor suspect's car and begins tasing, beating, and punching the driver.  Moreover, the officer elected to remain in the car even through the car stopped on several occasions.  There is no evidence in the record that Stewart posed an imminent danger to citizens or officers, making Rhodes' assertion of an imminent fear blatantly unreasonable, and the use of deadly force unjustifiable. *See Tennessee v. Garner*, 471 U.S. 1, 21 (1985).

The majority notes that Rhodes had no duty to retreat.  However, Rhodes likewise had a duty to only use such force as was necessary under the totality of the circumstances.  The fact that Rhodes shot Stewart five times at near point-blank range defies reasonableness.  This is the type of wantonness that does not require a case on point to put an officer on notice that his conduct is unreasonable.  As Judge Gorsuch opined, "some things are so obviously unlawful that they don't require detailed explanations" or happen so rarely that there will be no case on point. *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015).

Had Rhodes been standing outside of the car when he used lethal force, this would be a very simple case—he would not be entitled to qualified immunity. *See, e.g.*, *Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 346 (6th Cir. 2016) ("There is longstanding precedent holding that it is unreasonable for an officer to use deadly force against a suspect merely because he is fleeing arrest; rather, such force is only reasonable if the fleeing suspect presents an imminent danger to the officer or others in the vicinity."). However, in this Circuit, the Court has not encountered the exact situation that occurred in this case—the officer being *inside* of the car at the time of the shooting. That lack of precisely-analogous controlling law can oftentimes sound the death knell to a § 1983 claim. *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. at 503 (admonishing the Ninth Circuit for generally describing the clearly-established right as "the right to be free from excessive force"). Here, the majority sounds the death knell for Stewart's § 1983 claims and finds that the right was not clearly established, but I disagree.

In addition to this being a situation where precisely-analogous law should not be required, both in-circuit cases and out-of-circuit cases show that Rhodes violated Stewart's clearly-established right to be free from excessive force when he shot Stewart five times and killed him, even though he posed no imminent threat of physical injury or death to the officer or the public.

A.

Although this case presents a slight variation on the factual situations that this Court has addressed—inside the car versus outside the car—it does so against a backdrop of voluminous law involving fleeing suspects of which any reasonable officer would be aware. In that way, this case aligns with *Guertin v. Michigan*, 912 F.3d 907, 933 (6th Cir. 2019), in which we recently held that a right can be clearly established—even in the face of unique factual circumstances— when "[a]ny reasonable official should have known that" his or her actions violated the constitution. Indeed, the dissent in *Guertin* was particularly concerned that there were *no* prior cases with similar facts, *id.* at 957-62 (McKeague, J., dissenting), but that lack of analogous cases was not enough to overcome the clarity of the constitutional violation. *Guertin* is not an outlier in this respect, either. *Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005) ("[W]here a

general constitutional rule applies with 'obvious clarity' to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity." (citation omitted)).

This case fits the same bill. The law is clearly established in this Circuit that an officer may not use deadly force against a fleeing suspect unless the suspect is presenting an imminent threat of physical injury or death to the officer or the public. *See, e.g.*, *Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir.2005) (stating that "only in rare instances may an officer seize a suspect by use of deadly force." (quotations omitted)). Here, at the time Rhodes fired shots at Stewart, Stewart was unarmed, was not suspected of committing a serious felony, and was operating a stationary vehicle. Therefore, he presented no imminent threat of death or serious physical injury to any individual, and "any reasonable official should have known" that lethal force was plainly inappropriate. *See Guertin*, 912 F.3d at 933.

This conclusion bears out in ample case law. *See, e.g.*, *Sigley v. City of Parma Heights*, 437 F.3d 527, 537 (6th Cir. 2006) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend his [sic] does not justify the use of deadly force to do so." (citation and quotations omitted)). For instance, in *Smith v. Cupp*, the suspect stole the police officer's car and drove the car directly at the police officer. 430 F.3d at 770. The police officer began shooting at the car, allegedly firing his last shot while he was "jumping out of the direct path of the vehicle[.]" *Id.* Despite the danger the police officer faced as the car drove toward him, this Court denied the police officer's request for qualified immunity because, at the time of the last shot, the car did not pose a danger to the officer or the public, making it an "obvious case" despite the lack of "factually similar decisional law[.]" *Id.* at 776-77.

Again, the same can be said here. Although Rhodes asserts that he felt that he was in danger while the car was moving, and that he feared that he may be in danger if the car were to begin moving again, the fact remains that the car was not moving at the time Rhodes chose to shoot Stewart. This lack of imminent threat of serious physical injury renders lethal force

objectively unreasonable in this circumstance (despite Rhodes' individualized concern to the contrary). *See Garner*, 471 U.S. at 11-12.

B.

Although this case presents unique factual circumstances within this Circuit, there are at least *four* factually similar cases from other jurisdictions. The first is *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795-97 (9th Cir. 2014) (en banc). In *Gonzalez*, the police officer entered the suspect's vehicle when the suspect "stomped on the accelerator" in an effort to flee. *Id.* at 792-93. After the car had travelled fifty feet, the police officer fatally shot the suspect. *Id.* at 793. The Ninth Circuit found that, although the car was moving at the time the shots were fired, the suspect did not present an imminent danger to the officer or the public, so the police officer had violated the suspect's Fourth Amendment rights. *Id.* at 796-97.

The second, although a district court case post-dating the events of the case before us, is also instructive. *Adame v. City of Surprise*, No. cv-17-03200-phx-gms, 2019 WL 2247703 (D. Ariz. June 29, 2018). In *Adame*, a police officer instructed Adame to keep his hands up and visible, but Adame started his car and began pulling away. *Id.* at *1. The officer then entered the vehicle, told Adame to keep his hands up, and then fired two shots. *Id.* The district court found that the officer "violated Adame's clearly established Fourth Amendment rights by unreasonably resorting to lethal force under these circumstances." *Id.* at * 4.

Another instructive case is *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374 (Tex. Ct. App. 1994). In *City of Dallas*, a police officer engaged two men who were found crawling behind cars in a parking lot. *Id.* at 375. Eventually, the police officer entered the suspects' car, struggling with the driver, while the passenger was hitting the police officer from behind. *Id.* at 375-76. At that point, the police officer fatally shot the driver while they were both inside of the moving car. *Id.* The Texas court found that the police officer had not submitted evidence demonstrating that "a reasonably prudent officer, under the same or similar circumstances, could have believed that his decision—to draw and fire his gun in an attempt to stop the fleeing suspects—was justified." *Id.* at 377 (footnote and internal quotation marks omitted).

Finally, another district court determined that factually similar circumstances rendered the officer's use of lethal force unjustifiable in *Ford v. City of Pittsburgh*, 2016 WL 4367994 (W.D. Pa. Aug. 15, 2016). In *Ford*, the police officer also entered the suspect's car and, within seconds after the car started moving, fatally shot the suspect. *Id.* at *2. The court found that, viewing the evidence in the light most favorable to the plaintiff, a jury could find that the police officer's actions were objectively unreasonable—i.e., unconstitutional under the Fourth Amendment—and thus denied summary judgment to the police officer on qualified immunity grounds. *Id.* at *8.

While it is arguable that these four cases establish the "robust consensus" that would put a reasonable officer on notice of Stewart's specific rights, *see Moldowan v. City of Warren*, 578 F.3d 351, 381-82 (6th Cir. 2009) (citing three out-of-circuit cases as evidence that a robust consensus exists); *Stanton v. Sims*, 571 U.S. 3, 6-7 (2013) (considering state appellate court and district court decisions in assessing whether a robust consensus existed), what is more persuasive is that these four cases illuminate the application of the specific—and clearly established—right that an individual has to be free from lethal force when fleeing arrest in a car that is not presenting an imminent threat of serious physical harm to anybody. *Lewis*, 660 F. App'x at 343 ("[W]here the car no longer presents an imminent danger, an officer is not entitled to use deadly force to stop a fleeing suspect." (quotation marks and citation omitted)). Moreover, these four cases applied that specific right when the suspect's car was actually moving, whereas in our case Stewart's car was *stopped* when he was killed. That distinction makes it even more apparent that a reasonable officer would have known that lethal force was inappropriate in this case. As such, I would find that Stewart's rights were clearly established at the time that Rhodes shot and killed him.

## IV.

I find myself writing separately about the dangers of unchecked police powers with unsettling and increasing frequency. Six years ago, I dissented from a decision affirming summary judgment for several officers who killed Leroy Hughes, an African American man suffering from mental illness, by shocking him with tasers twelve times in five minutes. *See Sheffey v. City of Covington*, 564 F. App'x 783, 796-97 (6th Cir. 2014) (Donald, J., dissenting).

The first eight shocks occurred in a single minute. *Id.* at 796. The total delivery exceeded 14,000 volts. *Id.* at 797. In that dissent, I recalled the names of Amadou Diallo, Sean Bell, Oscar Grant, Jonathan Ferrell, and others. *Id.* at 798. And I exhorted this Court and its readers not to "ignore the seeds of systemic inequalities sown in our Nation's history and lain bare by diligent review." *Id.*

We have new names today: George Floyd, Elijah McClain, Rayshard Brooks, and too many others. The world knows why they died. The same seeds whose bitter fruit killed Leroy Hughes killed them too. And on March 13, 2017, in Euclid, Ohio, they killed Luke Stewart.

That the seeds of these senseless killings are systemic should not absolve the shooters. Our system of justice bestows upon police great powers and a sacred trust. We rightly protect police from penalties that otherwise would follow from poor conduct when officers act with reason. But when officers fail to act with reason, when they are motivated by impulses that spring from dark corners of the psyche or simply fail implicitly to acknowledge the humanity of the people before them, they violate our sacred trust. And then the same system that empowers and protects police must, if it is to function properly, if it is to be worthy of recognition as a system of justice, strip those powers and protections away.

Luke Stewart should be alive today. He was unarmed, unsuspected of committing a serious felony, and behind the wheel of a stationary vehicle when Rhodes opened fire into his torso, chest, neck, and wrist. Qualified immunity should not shield Rhodes from the consequences of that unreasonable decision.

I dissent.